# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE HARTFORD COURANT COMPANY, LLC,
      Plaintiff,

      v.

PATRICK L. CARROLL III, *et al.*,
      Defendants.

No. 3:19-cv-1951 (MPS)

## RULING GRANTING PRELIMINARY INJUNCTION

Plaintiff, The Hartford Courant Company, LLC (the "Courant"), is the publisher of *The Hartford Courant*, a newspaper widely circulated in Connecticut. In this lawsuit, the Courant challenges the confidentiality provisions of Connecticut's recently enacted Juvenile Transfer Act, Public Acts 2019, No. 19-187, codified at Conn. Gen. Stat. § 46b-127, which require that cases transferred from juvenile court to adult criminal court be conducted in private and that judicial records in such cases remain under seal unless and until a verdict is rendered or the defendant pleads guilty. Arguing that these provisions violate the right of access to court proceedings and records guaranteed by the First Amendment to the U.S. Constitution and article first, sections 4 and 5 of the Connecticut Constitution, the Courant seeks a declaration that the provisions are unlawful and an injunction against their enforcement. Compl., ECF No. 1 at 1, 16 (prayer for relief). The Defendants are the Chief Court Administrator of the Connecticut Judicial Branch, the Chief Clerks of Judicial District courts within the Connecticut Superior Court, and the Deputy Chief Clerks of Geographical Area courts within the Connecticut Superior Court ("Defendants"), all in their official capacities. *Id.* ¶¶ 5–6.

Before me now is the Courant's motion for a preliminary injunction, which seeks only part of the relief demanded in its complaint, namely, an order prohibiting Defendants from

1

sealing any newly filed judicial records and requiring Defendants to unseal all judicial records

that have previously been sealed under the challenged legislation. ECF No. 26. I held oral

argument on the Courant's motion on July 15, 2020. Because I find that the Courant has shown a

substantial likelihood of success on the merits of its First Amendment challenge, and that it has

satisfied the other prerequisites for a preliminary injunction, I grant the Courant's motion.[1]

## I.    LEGAL FRAMEWORK AND FACTUAL BACKGROUND

### A.    **Statutory Background**

#### 1.    *Connecticut's Juvenile Justice System*

In Connecticut, the Superior Court has four principal divisions: civil, criminal, family,

and housing. The Family Division handles juvenile matters, including delinquency proceedings.

*Organization of the Courts*, State of Conn. Judicial Branch,

https://www.jud.ct.gov/ystday/orgcourt.html. Juvenile matters include, *inter alia*, all proceedings

concerning neglected children within the state, termination of parental rights, adoption

proceedings, and "proceedings concerning delinquent children." Conn. Gen. Stat. § 46b-

121(a)(1)–(2); *id.* § 46b-120(1) (defining "child" as "any person under eighteen years of age who

has not been legally emancipated" or, for purposes of delinquency matters and proceedings, a

person between seven and eighteen years old at the time of the alleged commission of a

delinquent act).

A child under the age of sixteen may be adjudged a "delinquent" if he or she violated any

federal or state law (with certain exceptions), violated a municipal or local ordinance, willfully

failed to appear in a delinquency proceeding, violated any court order in a delinquency

proceeding, or violated conditions of probation supervision in a delinquency proceeding. *Id.* §

---

[1] I do not reach the Courant's arguments under the Connecticut Constitution.

46b-120(2)(A). A child who is sixteen or seventeen may be adjudged a "delinquent" if he or she

violated any federal or state law (with certain exceptions, including for motor vehicle offenses

and violations of municipal or local ordinances), willfully failed to appear, violated a court order,

or violated conditions of probation supervision. *Id.* § 46b-120(2)(B).

For a child who has been "convicted as delinquent," the Judicial Branch must provide for

"a comprehensive system of graduated responses with an array of services, sanctions and secure

placements . . . in order to provide individualized supervision, care, accountability, and

treatment" to the child. *Id.* § 46b-121r. The juvenile court must apply "services and sanctions and

make such secure placements in a manner consistent with public safety in order to (1) deter any

such child from the commission of any further delinquent act, and (2) ensure that the safety of

any other persons will not be endangered." *Id.* "In determining the appropriate disposition of a

child adjudicated as delinquent," the court must consider ten factors:

> (1) The child's age and intellectual, cognitive and emotional development;
> (2) the seriousness of the offense, including any aggravating or mitigating factors;
> (3) the impact of the offense on any victim;
> (4) the child's record of delinquency;
> (5) the child's willingness to participate in available programs;
> (6) the child's prior involvement with the Department of Children and Families as a committed delinquent;
> (7) the child's prior involvement with juvenile probation;
> (8) the child's history of participation in and engagement with programming and service interventions;
> (9) the identified services, programs and interventions that will best address the child's needs and risk of reoffending, as indicated by the risk and needs assessment administered by the Court Support Services Division and any other relevant evidence; and
> (10) the level of supervision indicated by the risk and needs assessment administered by the Court Support Services Division and any other relevant evidence.

*Id.* § 46b-140(a). A child who has been "convicted as delinquent" may not be "committed to the

Department of Children and Families as a result of such conviction." *Id.* § 46b-121q. Rather, the

"court may sentence any such child to a period of probation," *id.*, which may include a condition

requiring the child to participate in youth service programs, to reside with a particular parent or guardian, to attend school, to undergo medical evaluations, and to "satisfy any other conditions deemed appropriate by the court." *Id.* § 46b-140(c). Probation may also include a "period of placement in a secure, limited secure or nonsecure residential facility." *Id.* § 46b-121q. But a delinquent child may "not be placed on probation supervision with residential placement . . . unless a current predispositional study has been completed and reviewed by the court and: (1) Such placement is indicated by the child's clinical and behavioral needs; or (2) the level of risk the child poses to public safety cannot be managed in a less restrictive setting." *Id.* § 46b-140(g).

As the foregoing summary of the juvenile justice statutes suggests, the "goals of the juvenile justice system" in Connecticut are, on the whole, rehabilitative and restorative rather than punitive, aiming to:

> (1) Hold juveniles accountable for their unlawful behavior;
> (2) Provide secure and therapeutic confinement to those juveniles who present a danger to the community;
> (3) Adequately protect the community and juveniles;
> (4) Provide programs and services that are community-based and in close proximity to the juvenile's community;
> (5) Maintain and support juveniles within their homes whenever possible and appropriate;
> (6) Base probation case planning upon individual risks and needs;
> (7) Include the juvenile's family in case planning;
> (8) Provide supervision and service coordination where appropriate and implement and monitor the case plan in order to discourage reoffending;
> (9) Provide follow-up and community-based services to juveniles who are returned to their families or communities;
> (10) Promote the development and implementation of community-based programs designed to prevent reoffending and to effectively minimize the depth and duration of the juvenile's involvement in the juvenile justice system; and
> (11) Create and maintain programs for juveniles that (A) are developmentally appropriate, trauma informed and gender responsive, and (B) incorporate restorative principles and practices.

*Id.* § 46b-121h; *see also State v. Ledbetter*, 263 Conn. 1, 13–14 (2003) ("It is axiomatic that delinquency proceedings in juvenile court are fundamentally different from criminal proceedings

. . . . [A] delinquency petition does not charge a child with having committed a crime and . . .

adjudication of a juvenile offense is not a conviction . . . and does not permit the imposition of

criminal sanctions." (internal quotation marks and citations omitted)).

Consistent with their rehabilitative goals, juvenile delinquency proceedings in

Connecticut are confidential. "All records of cases of juvenile matters involving delinquency

proceedings, or any part thereof, shall be confidential," and may be disclosed only to certain

enumerated persons, such as the child's attorney, parents or guardians, and certain government

employees. Conn. Gen. Stat. § 46b-124(c). The records also "may be disclosed upon order of the

court to any person who has a legitimate interest in the information and is identified in such

order." *Id.* § 46b-124(e). In addition, all juvenile matters "shall be kept separate and apart from

all other business of the Superior Court as far as is practicable," and the judge hearing a juvenile

matter may exclude from the proceeding "any person whose presence is, in the court's opinion,

not necessary" (except for the victim, who may not be excluded unless good cause is shown). *Id.*

§ 46b-122(a)–(b).

### 2. *Juvenile Transfer Act*

On July 9, 2019, the Connecticut General Assembly enacted the Juvenile Transfer Act

(the "Act"), which became effective on October 1, 2019. *See* Public Acts 2019, No. 19-187,

codified at Conn. Gen. Stat. § 46b-127. The Act amended existing law governing the "transfer of

matters involving certain criminal charges against persons who were between the ages of fifteen

and eighteen at the time of the alleged offense from the juvenile docket to the regular criminal

docket" (hereinafter, "Transferred Matters"). Answer, ECF No. 23 ¶ 7; Compl., ECF No. 1 ¶ 7.

Specifically, as discussed below, the Act restricted access to proceedings and records of matters

transferred to the regular criminal docket, making them confidential.

Under the current version of Connecticut General Statutes § 46b-127(a)(1), "[t]he court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of a capital felony . . . , a class A felony, or a class B felony, . . . or a violation of section 53a-54d . . . ."[2] Section 46b-127(a)(3) provides exceptions to this automatic transfer provision for children charged with certain offenses; in such cases, "[u]pon motion of a prosecutorial official, the superior court for juvenile matters shall conduct a hearing to determine whether the case of any child charged with the commission of any such offense shall be transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court." The court "shall not order that the case be transferred . . . unless" it finds that:

> (A) such offense was committed after such child attained the age of fifteen years, (B) there is probable cause to believe the child has committed the act for which the child is charged, and (C) the best interests of the child and the public will not be served by maintaining the case in the superior court for juvenile matters. In making such findings, the court shall consider (i) any prior criminal or juvenile offenses committed by the child, (ii) the seriousness of such offenses, (iii) any evidence that the child has intellectual disability or mental illness, and (iv) the availability of services in the docket for juvenile matters that can serve the child's needs.

*Id.* § 46b-127(a)(3). Similarly, for children charged with the commission of a class C, D or E felony or an unclassified felony, upon the prosecutor's motion, the juvenile court must conduct a hearing to determine whether to transfer the case to the regular criminal docket of the Superior Court and may do so only if it makes the findings outlined in § 46b-127(a)(3). *Id.* § 46b-127(b).

Upon transfer, a "child shall stand trial and be sentenced, if convicted, as if such child were eighteen years of age." *Id.* § 46b-127(d). A child in a Transferred Matter may also plead guilty to a lesser offense in the regular criminal docket of the Superior Court; in this event, the

---

[2] Section 53a-54d sets forth penalties for "arson murder."

child "shall not resume such child's status as a juvenile regarding such offense." *Id.* "If the action is dismissed or nolled or if such child is found not guilty of the charge for which such child was transferred or of any lesser included offenses, the child shall resume such child's status as a juvenile until such child attains the age of eighteen years." *Id.*

To these provisions governing the transfer of juvenile matters to the regular criminal docket the Juvenile Transfer Act added § 46b-127(c)(1)(A), which requires that "[a]ny proceeding of any case transferred to the regular criminal docket pursuant to this section shall be private" and shall be conducted in a separate part of the courthouse. In addition, "[a]ny records of such proceedings shall be confidential in the same manner as records of cases of juvenile matters are confidential in accordance with the provisions of section 46b-124 . . . ." *Id.* § 46b-127(c)(1)(A). As discussed above, § 46b-124 provides that "[a]ll records of cases of juvenile matters involving delinquency proceedings . . . shall be confidential and for the use of the court in juvenile matters, and shall not be disclosed," with exceptions for the child's attorney, parents or guardians, and certain government employees and for disclosures allowed by court order to "any person who has a legitimate interest in the information." *Id.* §§ 46b-124(c), (e).[3] Before the Juvenile Transfer Act took effect on October 1, 2019, proceedings and records in Transferred Matters were public unless the matter was subsequently transferred to the Youthful Offender docket, which is described below. ECF No. 33 at 4–5 n.1.

**B.  Allegations in the Complaint**

In its complaint, the Courant alleges that § 46b-127(c)(1) "prohibits members of the public and the press from attending courtroom proceedings in Transferred Matters" and "from

---

[3] Both § 46b-124 and § 46b-127 also make exceptions to the confidentiality provisions for victims, providing that records "shall be available to the victim of the crime committed by the child," § 46b-127(c)(1)(B), or to the "victim of the delinquent act," § 46b-124(m).

accessing judicial records in Transferred Matters unless and until a guilty verdict or plea is entered." ECF No. 1 ¶¶ 11–12.[4] "Further," the Courant alleges, "judicial records in Transferred Matters will not be contemporaneously available in cases resulting in a guilty verdict or plea." *Id.* ¶ 12. The Courant alleges that "[s]ince October 1, 2019, judicial records in all newly Transferred Matters have been automatically sealed, and judicial records in over 100 Transferred Matters pending as of October 1, 2019 have been retroactively sealed." *Id.* ¶ 14.

The Courant alleges that the confidentiality provisions of the Juvenile Transfer Act "create[] a significant impediment to *The Hartford Courant*'s ability to inform its readers about matters of the utmost public interest and concern, and prevents *The Hartford Courant* from engaging in the kind of comprehensive investigative reporting that the paper is known for and that serves the public interest." *Id.* ¶ 15 (quoting Julien Decl., ECF No. 1-1 ¶ 19). The complaint attaches the declaration of Andrew Julien, the Publisher and Editor-in-Chief of *The Hartford Courant*, who states that the newspaper "regularly reports on criminal matters and criminal court proceedings" and that "*The Hartford Courant*'s ability to provide robust reporting on [matters involving juveniles tried as adults] helps the public to determine whether the proceedings are fairly conducted" and "alert[s] the public to possible improprieties and potential miscarriages of justice." Julien Decl., ECF No. 1-1 ¶¶ 1, 4.

The Courant provides examples of Transferred Matters that the newspaper cannot cover as a result of the Act:

- The highly publicized prosecution of now 59-year-old Michael Skakel for the 1975 murder of Martha Moxley, which occurred when Skakel was 15 years old, has been

---

[4] As discussed below and contrary to the interpretation offered by the Courant, I interpret § 46b-127(c)(1)(A) to permit access to the records once any verdict is rendered—guilty or not guilty—or once a defendant enters a guilty plea.

retroactively sealed. [5] ECF No. 1 ¶ 16. Skakel was tried as an adult and convicted of the 1975 murder in 2002. But in 2018, the Connecticut Supreme Court reversed his conviction based on ineffective assistance of counsel. The Courant alleges that Connecticut is "contemplating re-trying Skakel," but "Skakel's case has now been sealed pursuant to the Act." *Id.* As a result, if Skakel is retried, neither the public nor the press would be able to attend any criminal proceedings or access judicial records. *Id.*

- "[T]he Courant will be unable to provide information to the public about the prosecution of a 16-year-old defendant charged with first-degree manslaughter in connection with the hit-and-run death of a 71-year-old woman during an alleged shoot-out in Hartford in October 2019." *Id.* ¶ 17. Thus far, the incident "garnered significant public attention." *Id.* (citing two October 2019 articles published in *The Hartford Courant*).

- The Courant cannot cover the prosecution of "16-year-old Alexander Bolanos, who was charged with conspiracy to commit murder in connection with the December 2018 drive-by shooting death of a 12-year-old in Bridgeport, Connecticut." *Id.* ¶ 18. The newspaper reported on Bolanos's arrest and arraignment, but "[o]n information and belief, all records and proceedings in Bolanos' case have been sealed pursuant to the Act." *Id.* ¶ 19.

The Courant alleges that, by limiting access of the press and the public to Transferred Matters, the Juvenile Transfer Act violates the First Amendment of the U.S. Constitution and Article first, section 4 of the Connecticut Constitution and that the deprivation of these constitutional rights of access is causing it "immediate, irreparable harm." *Id.* ¶¶ 53–54.

## C. **Defendants' Declarations**

In opposition to the Courant's motion for a preliminary injunction, the Defendants contend both that no First Amendment right of access attaches to the Transferred Matters and that, even if the First Amendment applies, the confidentiality provisions of the Juvenile Transfer

---

[5] I take judicial notice of the widespread publicity surrounding Skakel's trial, appeal, and related proceedings. *See, e.g.*, Simon Crittle, *The Skakel Trial: Gruesome Details from Day Two*, TIME (May 9, 2002), http://content.time.com/time/nation/article/0,8599,236427,00.html; Eli Rosenberg, *Kennedy cousin Michael Skakel's murder conviction is overturned – again*, Washington Post (May 4, 2018, 10:07 PM), https://www.washingtonpost.com/news/post-nation/wp/2018/05/04/kennedy-cousin-michael-skakels-murder-conviction-overturned-again/; *see also Condit v. Dunne*, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) (taking judicial notice of "widespread publicity" and "media frenzy" and citing cases).

Act are supported by a compelling state interest. The Defendants have filed two declarations: one from Ralph Dagostine, the Deputy Director for Criminal Matters for the State of Connecticut Judicial Branch, ECF No. 33-2 ¶ 2, and one from Megan Kurlychek, a professor in the Department of Sociology and Criminology at Pennsylvania State University who was retained by the Defendants to offer her "expert opinions about the need and rationale for maintaining the confidentiality of juvenile criminal matters as it pertains to this case," ECF No. 33-3 ¶¶ 3–4. Professor Kurlychek's declaration attaches a report opining on "whether or not the state has a compelling interest in keeping confidential the records of individuals who were under the age of 18 at the time of their crime, regardless of whether they are tried in juvenile or adult court proceedings." ECF No. 33-3 at 4.

### 1. *Dagostine Declaration*

In his declaration, Ralph Dagostine—the Deputy Director for Criminal Matters for the State of Connecticut Judicial Branch—describes several provisions of the Juvenile Transfer Act and Conn. Gen. Stat. § 46b-127, including its confidentiality provisions. Specifically, Dagostine notes that records in juvenile delinquency proceedings and in Transferred Matters "may be disclosed upon order of the court to any person who has a legitimate interest in the information and is identified in such order." Dagostine Decl., ECF No. 33-2 ¶ 12 (quoting Conn. Gen. Stat. § 46b-124(e)). "On September 30, 2019," he states, "the Judicial Branch provided the Hartford Courant with a report listing all pending [Transferred Matters] that would cease to be open to the public when the Act's confidentiality provisions went into effect. The Report contained information about 116 pending [Transferred Matters], including the Docket Number and the defendant's name and date of birth." *Id.* ¶ 13. Dagostine is "not aware of any instance in which

the Hartford Courant or any of its employees have sought access to confidential records in transferred cases." *Id.* ¶ 14.

Dagostine states that, during the current COVID-19 pandemic, fewer juvenile cases have been transferred to the criminal docket: "only 12 such cases [were] transferred to the regular criminal docket between March 12, 2020, and May 1, 2020." *Id.* ¶ 27. In those few recently Transferred Matters, "there currently are virtually no proceedings taking place." *Id.* ¶ 28.

Finally, Dagostine describes the "significant impacts" that the Courant's requested preliminary injunction would have on the Judicial Branch and on juvenile defendants in Transferred Matters. If Transferred Matters were made public, "it will require the Judicial Branch to expend a significant amount of time and resources to reprogram each of these databases to properly reflect the change." *Id.* ¶ 30. The Judicial Branch would also have to notify various "downstream agencies" such as the Connecticut State Police and the Department of Correction of the injunction, and those agencies would need to change their own databases. *Id.* ¶ 32. In addition, because the Courant is seeking a preliminary injunction that would unseal only records and not court proceedings and because the Judicial Branch's databases currently make no distinction between the two, "the Judicial Branch will have to devise an alternate method to effectively notify staff and the public that records in [Transferred Matters] are public but that the proceedings themselves are not, and to effectively enforce that distinction." *Id.* ¶ 31. Dagostine claims that these steps are "particularly burdensome in the current public health emergency" due to limited staff. *Id.* ¶ 33.[6]

---

[6] The Courant points out that "providing access to court records in Transferred Matters was Defendants' practice prior to October 1, 2019," ECF No. 36 at 13, and that the Judicial Branch provided written testimony to the Legislature prior to the passage of the Juvenile Transfer Act citing "technical issues and implementation difficulties" it would face if required to seal records and close proceedings in Transferred Matters. *See Testimony of the Judicial Branch: Judiciary*

As to the juvenile defendants, Dagostine states that "since the Act went into effect on October 1, 2019, there have been more than 61 juvenile cases transferred to the regular criminal docket under § 46b-127." *Id.* ¶ 35. Only eleven of those Transferred Matters were discretionary transfers under § 46b-127(a)(3). *Id.* ¶ 36. If the records in those cases were made public, even temporarily, "the identity of the juvenile defendants [would] be forever known and associated with the case." *Id.* ¶ 35.

### 2. *Kurlychek Declaration and Report*

Professor Megan Kurlychek's declaration describes her experience in the field of juvenile justice and attaches the expert report she prepared at the Defendants' request. ECF No. 33-3 at 1–2. The Courant moved "to exclude the Kurlychek Report in its entirety or, alternatively, portions thereof pursuant to Federal Rules of Evidence 402, 403, and/or 702." ECF No. 37-1 at 2. I deny that motion. The Kurlychek Report is relevant since it supports the Defendants' arguments that the State has an interest in protecting juveniles from the stigma of association with criminal proceedings and, more broadly, in protecting both the well-being of minors and the safety of the public. I also find that Professor Kurlychek is qualified as an expert in juvenile justice policy, including the effect of criminal records on juvenile development and opportunities. Her report is based on books and articles from reputable journals and is largely a review of the relevant literature in the juvenile justice sphere. Her ultimate opinion—"that the state has a compelling interest in keeping the records of youth confidential regardless of the offense committed or the court in which they are processed"—is in line with teachings by the Supreme Court that "safeguarding the physical and psychological well-being of a minor" by

---

*Committee Public Hearing: H.B. 7389* (Mar. 25, 2019),
https://www.cga.ct.gov/2019/JUDdata/Tmy/2019HB-07389-R000325-State%20of%20CT%20Judicial%20Branch-TMY.PDF.

assuring privacy is a compelling state interest. *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 607 (1982). Although, as discussed below in the section on narrow tailoring, some of her opinions fit poorly with the specific design of the challenged confidentiality provisions, her opinion is admissible under Fed. R. Evid. 702.[7]

In her report, Professor Kurlychek explains that her "professional opinion was requested on whether or not the state has a compelling interest in keeping confidential the records of individuals who were under the age of 18 at the time of their crime, regardless of whether they are tried in juvenile or adult court proceedings." Kurlychek Report, ECF No. 33-3 at 4. She reviewed the Courant's complaint, the Defendants' Answer, the Juvenile Transfer Act, and the references she cites in her report, and she opines that the State of Connecticut has a "compelling interest in keeping confidential the records of youth accused, tried, but not yet found guilty of a crime in adult criminal courts." *Id.* at 5.

Kurlychek describes the origins of the separation of juvenile courts from adult courts in the late nineteenth century, which was based on the notion that "these youth could be changed and molded during these formative years making this a population well-suited for rehabilitation." ECF No. 33-3 at 7 (footnotes omitted). Early on, juvenile court judges recognized a need to keep records confidential in order to "protect [youths] from the social stigma that can accompany brandishing the title of 'delinquent' or 'criminal.'" *Id.* at 7–8. She argues that recent scientific research confirms that children and adolescents are less rational, more impulsive, more

---

[7] Because I accept as true Professor Kurlychek's averments, as well as those of Mr. Dagostine, there are no material facts in dispute, and I need not hold an evidentiary hearing to rule on the motion for preliminary injunction. *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required [to resolve a motion for preliminary injunction] when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case . . . .").

susceptible to peer pressure, and more amenable to treatment. *Id.* at 8–9. In addition, she argues, research suggests that "being labeled as a criminal, particularly at a young age, can serve to channel a youth towards a life of crime." *Id.* at 9. "[P]ublic access to criminal records of a youth's arrests, court proceedings and dispositions . . . . can create obstacles for youth seeking education, employment, housing and other opportunities," *id.* at 11, and "it is exactly these adult role opportunities . . . that help individuals desist from crime," *id.* at 16.

Kurlychek also discusses the role of media in influencing public opinion, overrepresenting crime "compared to its actual prevalence in society—particularly serious crimes," and sensationalizing and racializing crime. *Id.* at 16–17. As a result of the media's influence, "defendants in high profile cases may be tried and essentially found guilty by the news media before they reach a courthouse." *Id.* at 17. She also argues that these "media depictions of youth helped to drive the policies of the get-tough movement," including increased transfers from juvenile courts to adult courts. *Id.* at 19.

In conclusion, Kurlychek states that "the state has a compelling interest in keeping the records of youth confidential regardless of the offense committed or the court in which they are processed" because (1) releasing the name of the youth "serves no deterrent effect based upon the nature of youth decision-making and lack of forward understanding of consequences;" (2) releasing the names stigmatizes the youth, thereby limiting future opportunities in education, employment, housing, and social networks; and (3) the stigmatization "lead[s] to further criminality due to its impact on youth identity and structural opportunity." *Id.* at 22. Making the records of youths' criminal proceedings public, therefore, would run "contrary to the state's purpose of protecting the welfare of the children of the state and also contrary to protecting the general public's safety and well-being." *Id.*

## II.    LEGAL STANDARD

For the court to grant a preliminary injunction in this case, the Courant must show that it would otherwise suffer irreparable harm, that it has a clear or substantial likelihood of success on the merits, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Kelly v. Honeywell International, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Courant must show a likelihood of success on the merits—as opposed to the lesser showing of "sufficiently serious questions going to the merits to make them fair ground for litigation"—because it is challenging governmental action taken in the public interest under a statute. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (explaining that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly"). In addition, the Courant must show a "clear" or "substantial" likelihood of success on the merits—as opposed to just a likelihood of success on the merits— because a portion of the relief it seeks would unseal records that are currently sealed and thus change the status quo, making the injunction it seeks a "mandatory injunction" rather than just a "prohibitory injunction." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) ("Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits" (internal quotation marks omitted)); *id.* at 37 & n.5 (explaining that the status quo is "the last, actual, peaceable uncontested status which preceded the pending controversy" (internal quotation marks omitted)). The final two factors—the balance of the

equities and the public interest—merge when, as in this case, the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.   DISCUSSION

The Courant seeks a preliminary injunction "prohibiting Defendants . . . from sealing or permitting the sealing of any newly filed judicial records, including docket sheets, in any matter transferred to their respective courts pursuant to Section 46b-127(c)(1)" and "requir[ing] Defendants . . . to unseal all judicial records, including docket sheets, that have previously been sealed pursuant to Section 46b-127(c)(1)." ECF No. 26 at 2. Because the Courant has shown that it has a substantial likelihood of success on the merits of its First Amendment claim, that it would suffer irreparable harm in the absence of preliminary injunctive relief, and that the balance of equities and the public interest weigh in its favor, I grant the motion for a preliminary injunction.

### A.   <u>Likelihood of Success on the Merits</u>

When analyzing preliminary injunction motions in the First Amendment context, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Here, I find that the Courant has shown a clear and substantial likelihood of success on the merits of its First Amendment claim.

The Courant makes a facial challenge to Conn. Gen. Stat. § 46b-127(c)(1), claiming that "Section 46b-127(c)(1) violates the First Amendment to the U.S. Constitution by depriving members of the press and the public of their presumptive right to attend criminal proceedings and inspect judicial records in Transferred Matters." Compl., ECF No. 1 ¶ 43. In a facial challenge on First Amendment grounds, the court may invalidate a statute as overbroad if "a

16

substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). "[T]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 474 (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)).

The Defendants and the Courant agree that, under § 46b-127(c)(1), "all matters transferred from the juvenile docket to the regular criminal docket remain confidential," that all court proceedings in such matters "shall be private," and that court records of such proceedings "shall be confidential in the same manner as records of cases of juvenile matters." ECF No. 33 at 4–5. Section 46b-127(c)(1)(A) states that records of Transferred Matters "shall be confidential . . . unless and until the court or jury renders a verdict or a guilty plea is entered." At oral argument, the Defendants argued that, under this provision, records are unsealed and become publicly available when any verdict is entered, whether guilty or not guilty, or the defendant enters a guilty plea. I agree that this interpretation is the most natural reading of the plain language of the statute, which extends confidentiality until a "court or jury renders *a* verdict," *i.e.*, any verdict, whether guilty or not guilty.[8] Therefore, I construe § 46b-127(c)(1) to seal all court records in

---

[8] The Courant interprets this provision to refer only to *guilty* verdicts, due to language in § 46b-127(d) stating that if a juvenile in a Transferred Matter "is found not guilty of the charge for which such child was transferred or of any lesser included offenses, the child *shall resume such child's status as a juvenile* until such child attains the age of eighteen years" (emphasis added). *See* ECF No. 26-1 at 3. According to this interpretation, because juvenile matters are confidential, resuming "status as a juvenile" includes the sealing of the defendant's court records. Defense counsel asserted at oral argument, however, that the Chief Court Administrator has not been construing § 46b-127(c)(1) that way, and that resuming "status as a juvenile" relates to how the child would be treated if he or she were subsequently charged with another crime or delinquent act. Whether this latter interpretation of "resum[ing] status as a juvenile" is correct, I agree that the phrase does not refer to "resum[ing]" confidentiality. Because the General Assembly specifically addressed the confidentiality of records in Transferred Matters in § 46b-127(c)(1), it would be odd for it to have used the vague phrase "resume such child's status as a

Transferred Matters—to the same extent that records are confidential in juvenile matters under § 46b-124[9]—until the court or jury renders a guilty or not guilty verdict, or until the defendant pleads guilty.

### 1. *Right of Access*

It is well-established that "the First Amendment grants both the public and the press a qualified right of access to criminal trials" and related criminal proceedings such as voir dire and preliminary hearings. *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"); *Press-Enterprise Co v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"). As the Supreme Court explained in *Globe Newspaper Co. v. Superior Court for Norfolk County*,

> [T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process,

juvenile" in a different subsection of the statute, § 46b-127(d), to further address confidentiality issues. *See, e.g., Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir. 1996) ("When two statutes are in conflict, that statute which addresses the matter at issue in specific terms controls over a statute which addresses the issue in general terms, unless Congress has manifested a contrary aim."). In addition, the language in subsection (d) referring to "resum[ing] such child's status as a juvenile" *predates* the confidentiality provisions added by the Juvenile Transfer Act. *See* Public Acts 2019, No. 19-187 (H.B. 7389) (showing amendments in highlighting). Before the adoption of the Act, it would have made little sense to treat a dismissal of charges or a not guilty verdict in a Transferred Matter—both of which would have been public events before the 2019 adoption of the Act—as a basis for subsequently sealing the court records relating to the case; and any directive to undertake such a post-hoc veiling of the record would likely have been expressed in clearer terms. I thus construe § 46b-127(c)(1) to seal court records only until a verdict—whether guilty or not guilty—is rendered or a guilty plea is entered.

[9] Contrary to the Courant's position at oral argument, I find that § 46b-127(c)(1) incorporates all subsections of § 46b-124, including § 46b-124(e), which permits disclosure of juvenile records "upon order of the court to any person who has a legitimate interest in the information and is identified in such order." *See* § 46b-127(c)(1) (making records in Transferred matters "confidential in the same manner as records of cases of juvenile matters are confidential in accordance with the provisions of section 46b-124").

> with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

457 U.S. 596, 606 (1982). This First Amendment right of access extends also to certain judicial documents, including transcripts and docket sheets. *Pellegrino*, 380 F.3d at 93. Courts have "viewed the media's and public's qualified right of access to judicial documents as derived from or a necessary corollary of the capacity to attend the relevant proceedings," because "the ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible." *Id.* But the "Supreme Court has never determined whether the First Amendment right of public access attaches to juvenile proceedings." *United States v. Three Juveniles*, 61 F.3d 86, 89 (1st Cir. 1995).

The Defendants argue that the Courant "has not established that the qualified right of access to criminal cases must be extended to cases transferred from the juvenile docket to the regular criminal docket. ECF No. 33 at 11. Although they admit that the public and the press have a qualified right of access to "criminal trials brought against adults," ECF No. 33 at 11–12, the Defendants dispute that the same right of access should be extended to Transferred Matters, arguing that the tradition and logic of confidentiality in juvenile proceedings counsel in favor of maintaining confidentiality for cases on the Superior Court's criminal docket that involve juvenile defendants.

Supreme Court and Second Circuit case law make clear, however, that the right of access to court proceedings and records depends on the nature of the proceeding, not on the personal characteristics of the litigants. In determining whether there is a First Amendment right of access to particular proceedings or documents, courts have "emphasized two complementary

considerations[:] . . . whether the place and process have historically been open to the press and general public . . . [and] whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8 (internal quotation marks omitted). In applying these considerations, courts focus on the nature of the proceeding rather than the characteristics of the participants. In *Richmond Newspapers*, for example, the Supreme Court emphasized that a "presumption of openness inheres in the very nature of a criminal trial under our system of justice." 448 U.S. at 573. In *Globe Newspaper Co.*, the Court reaffirmed that "uniform rule of openness" in criminal trials, even those involving minor victims of sex offenses. 457 U.S. at 606 (holding that Massachusetts statute requiring trial judges to exclude the press and public from the courtroom during the testimony of the victim in certain cases involving sexual offenses against minor victims violated First Amendment). And in *New York Civil Liberties Union v. New York Transit Authority*, the Second Circuit reasoned that the public access cases "focus not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on the First Amendment principles at stake." 684 F.3d 286, 299 (2d Cir. 2012); *id.* at 300 (holding that the "First Amendment guarantees a presumptive right of access" to an administrative adjudication that operated under court-like procedures and imposed upon members of society "official and practical consequences" with "the force of law").

The proceedings at issue here in Transferred Matters are criminal prosecutions, including criminal trials and related pretrial proceedings, all of which take place on the regular criminal docket of the Superior Court. The statute specifically provides that "[u]pon the effectuation of the transfer, such child shall stand trial and be sentenced, if convicted, as if such child were eighteen years of age." Conn. Gen. Stat. § 46b-127(d). It is clear, then, that the "place and

process" involved here is one that has "historically been open to the press and general public,"

*Press-Enterprise II*, 478 U.S. at 8; the Supreme Court has held that the right of access to criminal

prosecutions has a long historical pedigree. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S.

555, 569 (1980) (plurality opinion) ("[A]t the time when our organic laws were adopted, criminal

trials both here and in England had long been presumptively open."); *Globe Newspaper Co. v.

Superior Court for Norfolk Cty.*, 457 U.S. 596, 605 (1982) (noting that in 1948, the Court was

"unable to find a single instance of a criminal trial conducted in camera in any federal, state, or

municipal court during the history of this country"). Even the history of Transferred Matters in

the Connecticut Superior Court is consistent with this tradition: the Defendants admit that,

"[p]rior to October 1, 2019, a case transferred from the juvenile docket to the regular criminal

docket was public unless it was subsequently transferred to the Youthful Offender Docket" under

Conn. Gen. Stat. § 54-76h.[10] ECF No. 33 at 4–5 n.1. The Defendants cite no case suggesting that

the right of access to proceedings and court records in a criminal prosecution has ever hinged on

the age or other personal characteristics of the defendant.

　　While it is true, as noted, that the Supreme Court has not determined whether a First

Amendment right of access extends to juvenile delinquency proceedings, the Transferred Matters

---

[10] Under Conn. Gen. Stat. §§ 54-76b and 54-76c, a minor who is between 16 and 18 years old or a child who has been transferred to the regular criminal docket of the Superior Court under § 46b-127 is "presumed to be eligible to be adjudged a youthful offender and the court having jurisdiction shall, but only as to the public, order the court file sealed," unless the defendant is charged with a class A felony or a violation of certain enumerated statutes or "has been previously convicted of a felony in the regular criminal docket of the Superior Court or [has] been previously adjudged a serious juvenile offender or serious juvenile repeat offender." The records of cases on this "youthful offender docket" "shall be confidential and shall not be open to public inspection" except upon order of the court. *Id.* §§ 54-76l(a)–(c). But, upon the prosecutor's motion, cases "shall be transferred from the youthful offender docket to the regular criminal docket of the Superior Court, provided the court finds that there is probable cause to believe the defendant has committed the act for which he or she is charged." *Id.* § 54-76c(b). The Courant has not challenged the confidentiality provisions related to the youthful offender docket.

21

are criminal prosecutions, not juvenile delinquency proceedings. Juvenile delinquency

proceedings "are fundamentally different from criminal proceedings," *Ledbetter*, 263 Conn. at

13–14, because they do not involve adjudications of guilt and, as described above, focus on

rehabilitation rather than punishment. *See also State v. Angel C.*, 245 Conn. 93, 103 (1998)

("There is no dispute that adjudication as a juvenile rather than prosecution as an adult carries

significant benefits, chief among which are a determination of delinquency rather than

criminality; confidentiality; limitations with respect to sentencing; erasure of files; and isolation

from the adult criminal population." (internal citations omitted)). An adjudication of delinquency

requires the court not to mete out punishment on behalf of the community but to apply "services,

sanctions and secure placements . . . in order to provide individualized supervision, care,

accountability, and treatment" to the child. *Id.* § 46b-121r. The goals of the juvenile justice

system are not only to "[h]old juveniles accountable for their unlawful behavior" but also to

provide therapeutic programs and services "designed to prevent reoffending and to effectively

minimize the depth and duration of the juvenile's involvement in the juvenile justice system." *Id.*

§ 46b-121h.

Juvenile delinquency matters are also procedurally different from criminal trials. While a

child in a delinquency proceeding does have some due process rights, he or she does not enjoy

the full array of procedural rights afforded to criminal defendants. *See In re Gault*, 387 U.S. 1, 14

(1967) (holding that children in juvenile delinquency proceedings have a right to notice of the

charges, the right to counsel, the right to confront and cross-examine witnesses, and a right

against self-incrimination); *McKeiver v. Pennsylvania*, 403 U.S. 528, 533 (1971) (plurality op.)

("The Court, however, has not yet said that all rights constitutionally assured to an adult accused

of crime also are to be enforced or made available to the juvenile in his delinquency proceeding.

Indeed, the Court specifically has refrained from going that far."). For instance, juveniles in delinquency proceedings do not have a constitutional right to a jury trial. *Id.* at 545. In *McKeiver*, the plurality opinion pointed to the differences between criminal trials and juvenile proceedings, which have "rehabilitative goals," *id.* at 547, and concluded that "[i]f the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence," *id.* at 551; *see also id.* at 550 ("If the jury trial were to be injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial."). Juvenile delinquency proceedings therefore differ in both form and function from the criminal prosecutions at issue in this case and constitute a distinct "place and process," *Press-Enterprise II*, 478 U.S. at 8, for purposes of assessing the First Amendment right of access.

The second prong of the *Press Enterprise II* test also supports a finding that the First Amendment right of access attaches to Transferred Matters because public access plays a significant positive role in the functioning of the judicial process in such matters. As with any criminal proceeding, public scrutiny of the Transferred Matters enhances quality, protects integrity, fosters an appearance of fairness, heightens respect, and permits the public to participate in and serve as a check upon the judicial process. *Globe Newspaper Co.*, 457 U.S. at 606. Transferred Matters involve charges of serious crimes in which the public has a clear interest and for which the juvenile defendants face severe potential punishments. The safeguards to the integrity of the factfinding process and the enhanced appearance of fairness that public access brings to judicial proceedings are not diminished by the age or other personal characteristics of the litigants. Both experience and logic, therefore, suggest that a qualified right of public access under the First Amendment attaches to Transferred Matters.

Defendants argue that transferring a case from the juvenile docket to the regular criminal docket does not change the age of the defendant or the state's associated interest in keeping the records about his or her case confidential. ECF No. 33 at 16. True, but the question for the moment is whether there is a First Amendment right of access at all; whether that right should prevail over countervailing interests is a separate question, which I address below. And, as shown, the age of the defendant does not alter the fundamental nature of the proceeding in a Transferred Matter, which becomes a criminal prosecution once the transfer occurs. In *Globe Newspaper Co.*, the Court held that the First Amendment guaranteed a qualified right of access to criminal trials even during the testimony of minor victims of a sex offense. 457 U.S. at 606. If the age of the victim does not affect whether there is a First Amendment right of access to criminal proceedings and records, there is no reason the age of the defendant should.[11]

I thus agree with the Courant that the same qualified First Amendment right of access that has long attended criminal proceedings attaches to the Transferred Matters and applies to both the proceedings and the court records in these cases.

### 2. *Compelling State Interest*

"Although the right of access to criminal trials is of constitutional stature, it is not absolute." *Globe Newspaper Co.*, 457 U.S. at 606. States may, at times, bar the public and the press from criminal trials if the state shows that doing so "is necessitated by a compelling government interest, and is narrowly tailored to serve that interest." *Id.* at 607. The Second

---

[11] Defendants also argue that "there are numerous ways in which the State treats a juvenile differently than an adult throughout the judicial process—including after transfer," such as by requiring courts to take into account a juvenile defendant's youth at sentencing. ECF No. 33 at 17-20. These and the other differences the defendants cite have no bearing, however, on the First Amendment right of access. For example, sentencing on the regular criminal docket is public regardless of the age of the defendant, since even the Juvenile Transfer Act makes proceedings and records confidential only until a guilty plea or a verdict. Conn. Gen. Stat. § 46b-127(c)(1).

Circuit has made the same point about access to court records: "We . . . hold that docket sheets enjoy a presumption of openness and that the public and the media possess a qualified First Amendment right to inspect them. Of course, this presumption is rebuttable upon demonstration that suppression is essential to preserve higher values and is narrowly tailored to serve that interest." *Pellegrino*, 380 F.3d at 96.

The Defendants argue that the State has "essential and compelling interests in maintaining the confidentiality of cases transferred from the juvenile docket during the pendency of the case" because maintaining confidentiality in such cases advances the "protection of vulnerable youth and promotion of public safety." ECF No. 33 at 22–23 (also citing the state's interests in "rehabilitating juveniles, improving the juveniles' prospects for reintegration into society, and shielding juveniles from the life-long consequences of publication of cases brought against them when they are ultimately found not guilty").

The Courant does not appear to dispute the State's general interest in protecting the privacy of juvenile defendants, arguing primarily that the blanket sealing of judicial records in all Transferred Matters is not narrowly tailored. "[S]afeguarding the physical and psychological well-being of a minor" is a compelling state interest. *Globe Newspaper Co.*, 457 U.S. at 607. And for all the reasons cited in the Defendants' brief and in the Kurlychek Report, I recognize that the stigma of involvement in criminal proceedings can be damaging to a juvenile defendant and to the public interest. For the purposes of this motion, therefore, I assume that the State has a compelling interest in protecting the confidentiality of court records and proceedings pertaining to juvenile defendants, including in Transferred Matters.

### 3. *Narrow Tailoring*

Even if the State has a compelling interest in protecting the privacy of juvenile defendants, however, the confidentiality provisions of the Juvenile Transfer Act are not narrowly tailored to achieve that goal because they reverse the presumption of openness, they sweep too broadly, their exceptions do not align with the State's stated goals, and they fail to take account of less restrictive alternatives to protect the privacy of juvenile defendants.

"Where, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.*, 457 U.S. at 606–07. In both *Press-Enterprise I* and *Press-Enterprise* II, the Supreme Court held that to order the closure of courtroom proceedings, a trial court must make "specific, on the record findings" that closure is essential "'to preserve higher values'" and is "'narrowly tailored to serve that interest.'" *Press Enterprise II*, 478 U.S. at 13–14 (quoting *Press Enterprise I* and requiring courts to find that "reasonable alternatives to closure cannot adequately protect the defendant's . . . rights"). As noted, the Second Circuit has likewise found that, for court records, if a qualified First Amendment right attaches, there is a presumption of access that is rebuttable only "upon demonstration that suppression is essential to preserve higher values and is narrowly tailored to serve that interest." *Pellegrino*, 380 F.3d at 96 (internal quotation marks and citations omitted). Section 46b-127(c)(1) reverses that presumption, automatically closing proceedings and sealing records unless a person files a motion seeking access, demonstrates "a legitimate interest in the information," and the court exercises its discretion to allow disclosure of the records. *See* Conn. Gen. Stat. § 46b-124(e) (providing that records "*may* be disclosed upon order of the court to any person who has a legitimate interest in

the information and is identified in such order" (emphasis added)). In *Globe Newspaper Co.*, the Court noted that "as compelling as [the state's interest in safeguarding the physical and psychological well-being of a minor] is, it does not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest." *Id.* at 607–08 (emphasis in original). Here, too, the State's interest in the "protection of vulnerable youth" does not justify a mandatory closure or sealing rule—or even a default closure or sealing rule—because the circumstances of individual cases affect the strength of the State's interest in protecting the defendant's privacy.

For example, because the Act seals the records of any Transferred Matter in which the defendant was under eighteen years old "at the time the offense was committed," ECF No. 23 ¶ 7, the Act seals records and closes court proceedings relating to some individuals who are adults when the proceedings occur or the records are created.[12] An extreme example the Courant points to is the case of 59-year-old Michael Skakel. Although Skakel's case has already been tried and appealed amidst intense publicity, it has now been sealed under the Juvenile Transfer Act. The Courant is thus currently unable to access the docket to determine, for example, whether the State is taking steps to retry Skakel. *See* Compl., ECF No. 1 ¶ 16. Though the confidentiality provisions of the Act purport to protect juveniles from the stigma of criminal charges, the Act would also "permit a 59-year-old public figure" like Skakel, whose association with a notorious

---

[12] Section 46b-127 requires courts to transfer "the case of any child charged with the commission of" the enumerated crimes, "provided such offense was committed after such child attained the age of fifteen years." Section 46b-120(1) defines "child" as "any person under eighteen years of age who has not been legally emancipated, except that [] for purposes of delinquency matters and proceedings," the term "child" includes anyone who is "eighteen years of age or older and committed a delinquent act prior to attaining eighteen years of age." The Defendants admit in their Answer that these provisions make the Juvenile Transfer Act applicable to persons "who were between the ages of fifteen and eighteen at the time of the alleged offense." ECF No. 23 ¶ 7.

criminal charge has already been seared into the public mind, "to be tried in complete secrecy." *Id.* While the Skakel example might be an outlier due to the unusually long gap between the criminal conduct and the prosecution, it would not be at all unusual for a defendant charged with committing a crime at age sixteen or seventeen to be at least eighteen years old by the time his case is tried. In short, the Act would seal a significant number of cases of defendants who are no longer juveniles.[13]

The Act has also sealed records and proceedings of defendants whose names were already publicly disclosed. As of September 30, 2019, there were "about 116 pending [Transferred Matters]" that were *retroactively* sealed on October 1, 2019, *i.e.*, after the cases had become public on the regular criminal docket. Dagostine Decl., ECF No. 33-2 ¶ 13. In addition, the Act would seal records and close proceedings even if the defendant and his parents or guardians wanted the courtroom open and the docket accessible and even if a judge found that "best interests of the child and the public will not be served" by maintaining the case as a juvenile delinquency proceeding, *id.* §§ 46b-127(a)(3), (b).[14] The Act's confidentiality provisions are thus substantially over-inclusive, retroactively sealing cases of defendants who are no longer juveniles or whose names have already been publicly disclosed, and mandating sealing for

---

[13] At oral argument, defense counsel stated there were four cases that were retroactively sealed on October 1, 2019 in which the defendant—though a juvenile at the time of the alleged crime— is now over the age of 25. Defense counsel stated that she did not know how many Transferred Matters involve defendants over the age of 18.

[14] The Defendants have pointed out that no defendants in Transferred Matters have sought to support the Courant's position in this action, raising the question whether any of them want the openness the Courant seeks. Nonetheless, courts have long recognized that the openness of criminal prosecutions helps shield defendants from unfair trials. *See, e.g., Waller v. Georgia*, 467 U.S. 39, 46 (1984) ("The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." (internal quotation marks omitted)). The Juvenile Transfer Act indiscriminately strips criminal defendants of these protections.

defendants who do not want or need it. The Act requires no finding that confidentiality is necessary to promote the State's interests in a particular case before dropping a veil over the entire proceeding.

Further, the confidentiality provisions do not effectively promote the State's goal of protecting juvenile defendants from stigma. To begin with, other statutes specifically permit the disclosure of a juvenile defendant's name and photograph. Section 46b-133(a) of the Connecticut General Statutes provides: "Notwithstanding the provisions of section 46b-124, the name, photograph and custody status of any child arrested for the commission of a capital felony . . . or class A felony may be disclosed to the public." For these juvenile arrestees—whose cases would be automatically transferred to the regular criminal docket under Conn Gen. Stat. § 46b-127(a)(1)—sealing judicial records after the arrest would not prevent stigma because the defendant's name, photograph, and association with the most serious of crimes would already be publicly available. *See Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 105 (1979) (finding that statute "does not satisfy constitutional requirements" and does not "accomplish its stated purpose" because it prohibited only "newspapers" from "printing the names of youths charged in a juvenile proceeding" but did not restrict electronic media from publishing the names).[15]

In addition, the Act seals records only until a verdict is reached or a guilty plea entered, making the records publicly available during post-verdict proceedings, sentencing, and appeal. The Defendants argue that the State has a compelling interest in protecting vulnerable youth from the stigma of a criminal record, and the Kurlychek Report explains that being publicly

---

[15] Sealing the records of court proceedings for these juvenile arrestees could even worsen the stigma and its collateral effects if the charges were later dropped or reduced because, in such a case, only the defendant's mugshot and the fact of his arrest for a capital or class A felony would be publicly available.

labeled as a "criminal" stigmatizes youths, limits their future opportunities in education, employment, housing, and social networks, and promotes further criminality. ECF No. 33-3 at 22. Section 46b-127(c)(1) does not effectively protect against these evils because it unseals the records of defendants after a verdict or a guilty plea, thereby exposing those defendants to the adverse effects Kurlychek describes. For such defendants, § 46b-127(c)(1) merely blocks contemporaneous access to their judicial records and proceedings.[16] This is so even if the defendant is found not guilty, *see supra* note 8, which makes the statute a poor vehicle for furthering what Kurlychek dubs the State's "compelling interest in keeping confidential the records of youth accused, tried, but not yet found guilty of a crime in adult criminal courts." *Id.* at 5. In short, the statute is not well tailored, let alone narrowly tailored, to further the interests identified by the Defendants.

The Defendants argue that § 46b-127 is narrowly tailored since it allows courts to issue an order granting access to any person with "a legitimate interest in the information," as long as the person is "identified" in the court's order. ECF No. 33 at 31; Conn. Gen. Stat. § 46b-124(e).

---

[16] The Defendants tout this feature of the statute as a sign of its constitutionality, arguing that it is "not [an] 'absolute bar' on disclosure of records" because the period of confidentiality extends "only to those parts of the proceedings that precede the verdict or a guilty plea." ECF No. 33 at 29–30. But, as the Courant notes, "[t]he American legal tradition has long assumed that 'contemporaneous review' of criminal prosecutions 'in the forum of public opinion' serves as an important restraint on abuse of government power." *United States v. Abuhamra*, 389 F.3d 309, 323 (2d Cir. 2004). Unsealing the records of Transferred Matters *after* a criminal trial has occurred or a guilty plea has entered does not vindicate the right of access to criminal proceedings; indeed, it ensures that no one will be able to make use of the records as a guide to attending the proceedings, one of the principal bases for the presumption of openness that attaches to docket sheets and similar court records. *Pellegrino*, 380 F.3d at 93 ("[T]he ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible. In this respect, docket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment.").

This provision does not save the Act, however, because, as discussed, it reverses the presumption of openness, making sealing the default rule and requiring an affirmative step—a court order—to unseal. The First Amendment requires just the opposite for criminal prosecutions—that any sealing (or closure) be undertaken only by a court order supported by specific findings that such sealing (or closure) is essential to further a compelling interest and narrowly tailored to serve that interest. In addition, this avenue of access is of little practical value to the media or interested members of the public, who have no way of knowing that any new Transferred Matters even exist; it is difficult to request records about a case one has no knowledge of.[17]

In addition, the Defendants have not explained why less restrictive alternatives are inadequate to protect the privacy of juvenile defendants—even in individual cases where a court finds some privacy protection to be necessary. Connecticut trial judges commonly employ measures short of closing a courtroom or sealing an entire court file, such as redactions and pseudonyms, to protect important privacy interests. *See* Conn. P.B. § 11-20A(h) (allowing use of pseudonyms where court concludes it is "necessary to preserve an interest which is determined to override the public's interest in knowing the name of the party or parties"); *State v. Abushaqra*, No. H12MCR110235121S, 2015 WL 5135109, at *8 (Conn. Super. Ct. July 13, 2015), *aff'd*, 164 Conn. App. 256 (2016) (ordering redaction of inflammatory information from deposition transcripts and affidavits to protect defendant's Sixth Amendment right to a fair trial); *cf. Daily Mail Pub. Co.*, 443 U.S. at 108–09 (Rehnquist, J., concurring) (noting that the press could still

---

[17] Read literally, Section 46b-124(e) would also impose a prior restraint on the media, as it requires anyone who obtains access to records with the court's permission to seek further court permission before disclosing them to anyone else. Conn. Gen. Stat. § 46b-124(e) ("Records disclosed pursuant to this subsection shall not be further disclosed, except as specifically authorized by a subsequent order of the court.").

perform its "watchdog" role by "describ[ing] the details of the offense and inform[ing] the community of the proceedings against the juvenile" even if it could not publish the juvenile defendant's name). In *Press-Enterprise I*, the Court addressed the prolonged closure of the voir dire process in a rape and murder trial undertaken to protect the privacy of the prospective jurors who were questioned about sensitive personal matters. 464 U.S. at 510. The Court held that the trial court's order of closure was unconstitutional because it "failed to consider whether alternatives were available to protect the interests of the prospective jurors," such as requiring a prospective juror to make an affirmative request for privacy, sealing portions of the transcript, or withholding the name of the juror in the transcript. *Id.* at 512; *see also Press-Enterprise II*, 478 U.S. at 14 (requiring courts to make specific findings before closing a preliminary hearing, including that "reasonable alternatives to closure cannot adequately protect the defendant's . . . rights"). Section 46b-127(c) reaches far beyond these less-restrictive alternatives, sealing court files in their entirety in every Transferred Matter. To be sure, in some cases, redaction or the use of pseudonyms may provide inadequate protection, and full sealing of court records may be necessary. But the First Amendment requires that a judge weighing the unique facts of each case make that determination on a case-by-case basis.[18]

---

[18] As Amicus Floyd Abrams Institute for Freedom of Expression notes, Connecticut courts are well-equipped to balance the interests of a minor defendant against the public's right of access based on the specific circumstances of each case, and the Connecticut Practice Book already sets forth a detailed procedure for doing so. *See* Conn. P.B. §§ 11-20, 11-20A (courtroom closure and record sealing procedures for civil cases); *id.* §§ 42-49, 42-49A (same for criminal cases; allowing judge to issue order sealing records if it is "necessary to preserve an interest which is determined to override the public's interest in viewing such materials," if the judge "first consider[s] reasonable alternatives to any such order" and makes such order "no broader than necessary to protect such overriding interest," and if the judge "articulate[s] the overriding interest being protected" and "its findings underlying such order" on the record).

At oral argument, the Defendants suggested that the State's main concern is preserving confidentiality for juvenile defendants whose cases might be dismissed, nolled, or transferred back to the juvenile docket under §§ 46b-127(a)(2), (c)(2), or (g).[19] For those defendants, the Defendants argue, § 46b-127(c)(1) effectively protects them from stigma by sealing their records indefinitely. But if confidentiality for these defendants is the State's primary concern, then the Juvenile Transfer Act is grossly overbroad. The Defendants offer no evidence as to how many Transferred Matters are dismissed, nolled, or transferred back to the juvenile docket, so they have not shown that § 46b-127(c)(1) primarily affects this class of cases. Further, the statistics the Defendants did submit suggest that few of the Transferred Matters since October 1, 2019 could be transferred back to the juvenile docket. Of the 61 juvenile cases transferred to the criminal docket since October 1, 2019, 50 of those cases were transferred automatically under § 46b-127(a)(1), which means the defendants were charged with a class A or class B felony. Dagostine Decl., ECF No. 33-2 ¶¶ 35–36. Defendants charged with a class A felony may not be transferred back to the juvenile docket, and defendants charged with a class B felony may be transferred back only upon the motion of the prosecutor. Conn. Gen. Stat. § 46b-127(a)(2).

For all these reasons, I find that the Courant has shown a clear and substantial likelihood of success on the merits of its claim that § 46b-127(c) is not narrowly tailored to achieve a compelling state interest and therefore unconstitutionally infringes upon the First Amendment right of access to court records in criminal prosecutions.

---

[19] The legislative history of the Juvenile Transfer Act does suggest this more limited concern played some role in the legislation. The original draft of the bill provided confidentiality only for defendants subject to discretionary transfer under § 46b-127(a)(3) or § 46b-127(b), whose cases can be transferred back to the juvenile docket by the court's own motion under § 46b-127(c)(2) or § 46b-127(g). *See* ECF No. 36 at 9 (citing Raised H.B. 7389, Jan. 2019 Sess., at 2).

**B.  <u>Irreparable Harm</u>**

"[T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In *New York Civil Liberties Union v. New York City Transit Authority*, the Second Circuit affirmed an injunction prohibiting enforcement of a city policy limiting public access to Transit Adjudication Bureau proceedings, finding that the plaintiff's "ability to carry out its mission would be irreparably harmed through the continued violation of [the public's First Amendment right of access to government proceedings]." 684 F.3d 286, 305 (2d Cir. 2012).

Here, the confidentiality provisions of the Juvenile Transfer Act, Conn. Gen. Stat. § 46-127(c)(1), are currently impeding the Courant's right of access to judicial records in Transferred Matters since the Courant has no contemporaneous access to the records of any Transferred Matter. Thus, as the Courant argues, each passing day that the confidentiality provisions of § 46b-127 remain in effect infringes on its First Amendment rights. ECF No. 26-1 at 14–15. Moreover, the Courant has identified specific cases that have been the subject of media interest but in which it "is no longer able to access docket information or judicial records" as a result of the Juvenile Transfer Act. *See, e.g.*, Julien Decl., ECF No. 1-1 ¶ 11 (stating that the newspaper can no longer access any records or docket information relating to the Alexander Bolanos case). In Transferred Matters such as these, the Courant is being irreparably harmed by continued

34

violation of its First Amendment right of access to judicial records. The Courant has submitted

evidence that the ongoing lack of access "creates a significant impediment to *The Hartford

Courant*'s ability to inform its readers about matters of the utmost public interest and concern,

and prevents *The Harford Courant* from engaging in the kind of comprehensive, investigative

reporting that the paper is known for." *Id.* ¶ 19.

Pointing again to § 46b-124(e), the Defendants argue that the Courant will not be

irreparably harmed in the absence of a preliminary injunction because the Courant may "request

a Court order granting access to records from any pending [Transferred Matter]." ECF No. 33 at

32. But the defendants' reliance on § 46b-124(e) does no more to alleviate the Courant's

irreparable harm than it does to shore up the unconstitutional flaws in the Juvenile Transfer Act.

As the Courant points out, "all judicial documents, including docket sheets, in all new cases

transferred under the Act since the Effective Date are sealed. As a result, the press and the public

have no notice of even the *existence* of new Transferred Matters. The press cannot seek

contemporaneous access to sealed records in Transferred Matters that it has no notice of." ECF

No. 36 at 8 (internal citations omitted). Even as to the 116 Transferred Matters that were pending

when the Act took effect, the Courant's knowledge of the defendant's name and the docket

number would not meaningfully assist it in filing a motion to obtain current information about

the case now that the records are sealed. ECF No. 33-2 ¶ 13. The Courant has no way of knowing

in which of these matters there have been proceedings or recent court orders that might be

newsworthy. Short of continuously filing motions in all of these cases, it is not clear how the

Courant could obtain the access to which it is entitled without the requested injunction.

Defendants also argue that the Courant is not facing any irreparable harm because

proceedings in Transferred Matters are currently "extremely limited" in light of the COVID-19

35

pandemic. ECF No. 33 at 32. The Defendants confirmed at oral argument on July 15, 2020 that, since March, the Judicial Branch has been conducting some arraignments and competency hearings via videoconference but has not been conducting any evidentiary hearings or trials. But Dagostine's declaration states that 12 juvenile matters were "transferred to the regular criminal docket between March 12, 2020, and May 1, 2020." Dagostine Decl., ECF No. 33-1 ¶ 27. Under the confidentiality provisions of § 46b-127, the Courant does not have access to the records of any of these matters and, but for Dagostine's declaration, would not even know that these matters existed or that they were transferred to the criminal docket. The Courant's First Amendment right of access extends to docket sheets and court records, even in times when no court proceedings are occurring. *Pellegrino*, 380 F.3d at 93. Indeed, the transfer of a juvenile case to the regular criminal docket—which would be reflected in the currently sealed court records—may itself be a newsworthy event. Therefore, the Courant has shown that, in the absence of preliminary injunctive relief, it will suffer irreparable harm in the form of an ongoing First Amendment injury.

### C. **Balance of Equities and Public Interest**

The balance of equities and public interest favor a preliminary injunction here because there is a public interest in avoiding violations of constitutional rights. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest."). While there is also a public interest in protecting juvenile defendants from the stigma of criminal charges, as discussed above, Connecticut trial judges are well-equipped to protect that interest in the context of individual cases. And while there will be some burden imposed on the Connecticut Judicial Branch in reprogramming its databases to reflect the changes ordered by this ruling, that consideration must yield to the First Amendment. The

Courant's First Amendment right of access in this case can be secured only by enjoining enforcement of the record-sealing provisions of § 46b-127(c)(1).

## IV.     CONCLUSION AND ORDER

The Courant's motion for a preliminary injunction, ECF No. 26, is therefore GRANTED, and the Court enters the following order:

(1) The individual defendants, their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with them are ENJOINED from automatically sealing or permitting the automatic sealing of any newly filed judicial records, including docket sheets, in any case transferred from the juvenile docket to the regular criminal docket pursuant to Conn. Gen. Stat. § 46b-127 after the date of this order, unless a Superior Court judge in a particular case issues an order requiring the sealing of specific records. This order does not prevent any parties from filing a motion to seal as to some or all of the court records in individual Transferred Matters.

(2) Absent an order by a Superior Court judge in a particular case, the individual defendants, their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with them are ORDERED to unseal all judicial records, including docket sheets, in cases that were automatically transferred to the regular criminal docket pursuant to Conn. Gen. Stat. § 46b-127(a)(1) before the date of this order. However, this portion of the order is **STAYED for 30 days** to allow parties in individual Transferred Matters to file a motion to seal as to some or all of the court records if they wish to do so.

(3) In any case transferred to the regular criminal docket pursuant to Conn. Gen. Stat. § 46b-127(a)(3) or § 46b-127(b) before the date of this order, the records shall remain under seal for 30 days following this order so that parties in individual Transferred Matters may file a

motion to seal as to some or all of the court records or a motion to transfer the case back to the

juvenile docket under §46b-127(c)(2) or § 46b-127(g) if they wish to do so. After the expiration

of the period 30 days from the date of this order, the records in these cases shall be unsealed,

except as to specific records ordered sealed during that period by a Superior Court judge.

(4) The Court waives the bond requirement of Fed. R. Civ. P. 65(c) because the Courant

has brought an action that promotes the public's interest in securing access to court records and

proceedings. *Pharm. Soc. of State of New York, Inc. v. New York State Dep't of Soc. Servs.*, 50

F.3d 1168, 1174 (2d Cir. 1995); *Libertarian Party of Connecticut v. Merrill*, No. 15-CV-1851

(JCH), 2016 WL 10405920, at *8 (D. Conn. Jan. 26, 2016) (not requiring a bond under Rule

65(c) because "this litigation is in the public interest insofar as it seeks to vindicate the public's

First Amendment rights").

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:  Hartford, Connecticut
        July 24, 2020